# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00052-CV

**DeWayne Krawl, Individually and as the Executor of the Estate of Grace Eloise Krawl, Deceased; Kimali Jane Kane; Karen Sue Kenyan; and Randall William Krawl, Appellants**

**v.**

**R. Vincent Murray, Jr., M.D.; and Sunbridge Health Care Corporation d/b/a Sunbridge Care & Rehabilitation for Highland Hills f/k/a Sunrise Health Care Corporation, Appellees**

## FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
## NO. 73657A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

DeWayne Krawl, Individually and as the Executor of the Estate of his mother, Grace Eloise Krawl, Deceased ("Mrs. Krawl"), and his siblings, Kimali Jane Kane, Karen Sue Kenyan, and Randall William Krawl (collectively, "appellants"), sued appellees R. Vincent Murray, Jr., M.D. and Sunbridge Health Care Corporation d/b/a Sunbridge Care & Rehabilitation for Highland Hills, f/k/a Sunrise Health Care Corporation ("Highland Hills") for negligence. Mrs. Krawl was a resident of the nursing home operated by Highland Hills and was Dr. Murray's patient. Appellants alleged that Highland Hills and Dr. Murray (1) were negligent in their care, causing Mrs. Krawl to suffer ulcers,

infections, and pneumonia, which led to her death, and (2) failed to inform the family of her worsening condition. A jury found in favor of Highland Hills and Dr. Murray, and the trial court entered a take-nothing judgment. On appeal, appellants contend the evidence is factually insufficient to support the jury's verdict. We will affirm.

**Standard of Review**

When an appealing party attacks a jury's failure to find on issues upon which it had the burden of proof, to prevail, it must demonstrate that its cause of action was established as a matter of law. *Vinson v. Brown*, 80 S.W.3d 221, 228 (Tex. App.—Austin 2002, no pet.); *see Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). This is a difficult burden and the party essentially must show that it established all vital facts in support of its issues so conclusively as to be entitled to judgment as a matter of law. *Vinson*, 80 S.W.3d at 228; *see Sterner*, 767 S.W.2d at 690. In this cause, however, appellants do not assert that the evidence is legally insufficient to support the jury's failure to find in their favor, nor do they contend that they conclusively proved the contrary proposition. They contend only that the evidence supporting the jury's failure to find in their favor was against the great weight and preponderance of the evidence, and they seek only to have the cause remanded for a new trial. Assuming without deciding that appellants would be entitled to relief without having conclusively established all issues on which they had the burden of proof, we will conduct a factual sufficiency review alone, without regard to the legal sufficiency. As discussed below, because we hold that appellants have not shown the evidence is insufficient to support the jury's failure to find in their favor, we need not discuss appellants' failure to establish the contrary proposition as a matter of law. *See Sterner*, 767 S.W.2d at 690.

2

We review the factual sufficiency of the evidence supporting a jury's failure to find a fact under the same standard used to review affirmative findings. *McMillon v. Texas Dep't of Ins.*, 963 S.W.2d 935, 938 (Tex. App.—Austin 1998, no pet.); *see Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988). Thus, we view the record as a whole, weigh all the evidence, and may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *McMillon*, 963 S.W.2d at 938. The jury as fact-finder is the sole judge of witness credibility and the weight to be given the testimony. *Simons v. City of Austin*, 921 S.W.2d 524, 531 (Tex. App.—Austin 1996, writ denied). We will not substitute our opinion for that of the jury if the verdict is sufficiently grounded in the evidence. *Id*.

**Factual Summary**

In September 1995, Mrs. Krawl was admitted to Highland Hills suffering from dementia, and was later diagnosed as suffering from Alzheimer's. Dr. Murray came to Highland Hills occasionally and was kept informed of Mrs. Krawl's condition by telephone calls and faxes from Highland Hills. It is undisputed that Dr. Murray last examined Mrs. Krawl in April 1999 and in the two prior years had failed to visit her every six months, as required by Medicare. In the last six months of her life, Mrs. Krawl's health worsened, she became bedridden and had trouble swallowing, and she eventually contracted bronchopneumonia, the "terminal event" that caused her death on August 25, 1999, three days short of her seventy-sixth birthday.

In February 1999, DeWayne Krawl, Mrs. Krawl's son, signed a "Do Not Resuscitate" order ("DNR order"), stating that resuscitation measures should not be initiated should Mrs. Krawl

go into cardiac or respiratory arrest. In March 1999, Dr. Murray spoke to Karen Kenyon, Mrs. Krawl's daughter, and "confirmed their wishes for conservative terminal care." Dr. Murray believed that the Krawls would discuss whether to feed Mrs. Krawl artificially or to allow nature to take its course; the family never contacted him regarding their decision on feeding tubes. Dr. Murray took Kenyon's use of the term "conservative care" to mean giving Mrs. Krawl "comfort care and allowing the disease to progress in its natural course." Kenyon testified that she discussed feeding tubes with Dr. Murray and told him that the family had not reached a decision. Kenyon said she did not have a full understanding of the meaning of the term "conservative terminal care." In March, Highland Hills asked the Krawl family about funeral homes. On August 22, Highland Hills told DeWayne that the family should discuss feeding tubes, but DeWayne testified that he did not realize Mrs. Krawl's need for artificial feeding was imminent.

The medical examiner who conducted an autopsy of Mrs. Krawl testified that most Alzheimer's patients die of pneumonia because they lose the ability to cough; Alzheimer's patients often die even when being treated with antibiotics. Mrs. Krawl was well nourished, and the autopsy indicated she "had been eating more or less properly before she died." During the autopsy, he found two pressure sores, both treated and covered with surgical dressing and neither showing signs of infection. Such sores are not uncommon in bedridden patients, and one of appellants' experts testified that they were not due to negligence.

Highland Hills's records indicate that the nursing staff monitored and attempted to treat Mrs. Krawl's rapid weight loss, swallowing problems, and pressure sores. Highland Hills kept Dr. Murray and Mrs. Krawl's family informed about her weight loss and difficulty swallowing, her

4

pressure sores and their treatment, and her general decline. Highland Hills's records show that on August 22 members of the family visited, reminded a nurse of Mrs. Krawl's DNR status, and said they would discuss feeding tubes. On August 25, Highland Hills's nursing staff observed signs of pneumonia and faxed a report to Dr. Murray. Mrs. Krawl died about ninety minutes later.

Appellants' experts believed that Dr. Murray and Highland Hills failed to monitor Mrs. Krawl adequately and ensure she received adequate hydration and nutrition. Several experts agreed that a feeding tube might have extended Mrs. Krawl's life from two weeks to several months, but would not have improved her quality of life. They further testified about the risk of infection when inserting a tube directly into a patient's stomach or of food aspiration leading to pneumonia when inserting a tube down a patient's throat. There was testimony that patients with dementia sometimes have to be restrained to keep from pulling out their feeding tubes. One of appellants' experts testified that he would have recommended against a feeding tube, had the family asked him.

Appellants' experts also believed Dr. Murray should have ordered tests and lab work and examined Mrs. Krawl himself, and that the nursing home should have called Dr. Murray on August 25, rather than using faxes to communicate urgent matters. Dr. Murray testified that he rejected requests for various tests because Mrs. Krawl showed no signs of an infection and he knew her swallowing problems were due to Alzheimer's. He testified that he did not see the fax sent on August 25; if he had, he would have gone to see Mrs. Krawl. He also believed antibiotics would not have saved her life. One of appellants' experts said it was unlikely that Dr. Murray could have saved Mrs. Krawl had he had gone to the nursing home immediately. He agreed that patients like Mrs. Krawl can develop pneumonia very quickly and die within a matter of hours, and testified that hers

5

developed at most one and one-half days before her death. Experts testified that, although she might have recovered had her pneumonia been treated early enough, end-stage Alzheimer's patients usually suffer from increasingly severe and repeated bouts of pneumonia.

Appellees' expert testified that it would have been appropriate for Dr. Murray, having been told to treat Mrs. Krawl conservatively, to decide against tube feeding and antibiotic therapy in favor of only comfort measures. He concluded that Dr. Murray did not proximately cause Mrs. Krawl's death, and that Highland Hills's care did not fall below the standard of care.

**Conclusion**

It is clear that the evidence in this case is factually sufficient to support the jury's failure to find that negligence on the part of Highland Hills or Dr. Murray proximately caused Mrs. Krawl's death. Mrs. Krawl was in the end stages of Alzheimer's disease. Several witnesses testified that pneumonia is a very common cause of death in such patients and that it can strike quickly, killing patients in a matter of hours. There was evidence that the Krawl family was aware of Mrs. Krawl's condition and the option of a feeding tube. One of appellants' experts said he would not have recommended a feeding tube in this case. Dr. Murray believed the family wished for Mrs. Krawl to receive conservative terminal care, meaning comfort care without attempts to prolong her life. Although Mrs. Krawl lost weight rapidly at the end of her life, there was testimony that such an occurrence is not unusual in these cases and that she remained well-nourished. The presence of two pressure sores was not of concern to most of the medical experts, who said bedridden patients often develop sores under the best of care. Having viewed the record as a whole and weighed all the evidence, we hold that the jury's verdict was not so contrary to the overwhelming weight of the

6

evidence as to be clearly unjust. *See McMillon*, 963 S.W.2d at 938. We affirm the trial court's judgment.

_____

Mack Kidd, Justice

Before Chief Justice Law, Justices Kidd and Patterson

Affirmed

Filed: October 30, 2003